**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

JOHN TEMPLE, individually and on behalf
of all others similarly situated,

                Plaintiff,

v.

BEST RATE HOLDINGS, LLC and
LENDING TREE, INC.

                Defendants.

Case No. 8:18-cv-00176-CEH-JSS

CLASS ACTION

JURY TRIAL DEMANDED

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT**
**BEST RATE'S MOTION TO COMPEL ARBITRATION**

## I.    INTRODUCTION

This case challenges Defendants Best Rate Holdings, LLC's ("Best Rate") and Lending Tree, Inc.'s ("Lending Tree") (collectively "Defendants") serial violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq.* The claims are straightforward: Best Rate and Lending Tree blast out text messages urging consumers to refinance their home loans or to obtain new mortgages. But there's a fatal flaw: the opt-out mechanism on Defendants' text messaging platform fails to honor and process valid "Stop" requests so that the sending of messages is discontinued. Indeed, rather than receive a STOP message from a consumer's phone and cease the transmission of future texts, Defendants continue to send unsolicited text messages to users in blatant violation of the TCPA.

Plaintiff John Temple ("Plaintiff" or "Temple") is just one of many consumers who tried to opt-out by responding "STOP" but kept receiving Defendants' messages. Yet rather than apologize to Temple, let alone correct their errors, Defendants seek to deny Temple (and potentially numerous others) their day in court by pointing to an arbitration provision supposedly

1

found in the Terms and Conditions ("Terms") on a website located at www.veteransvaloans.com (the "Veteran's Loans Website").

The problem for Defendant Best Rate is that the Terms on the Veteran's Loans Website constitute an unenforceable "browsewrap" agreement. That is, Best Rate requires users to complete multiple data entry sections across four separate webpages—all without any reference or prompt to the Terms. Instead, Best Rate buries a hyperlink to the Terms in the fine print found at the very end of this process. No review or affirmative acceptance by the consumer is provided. Accordingly, visitors are not put on reasonable notice of any arbitration agreement.

In any event, and assuming solely for the sake of argument that the Court finds that a valid contract to arbitrate exists, Temple's claims fall outside the scope of Best Rate's agreement. The arbitration provision is narrow and applies only to Best Rate's "Site Offerings"—which do not encompass subsequent interactions with Best Rate or Lending Tree.

Finally, the Terms are unenforceable because they are procedurally and substantively unconscionable. The Terms represent a contract of adhesion that is entirely one-sided. Not only do the Terms include a class action waiver while allowing Best Rate to obtain class-wide injunctive relief, the arbitration provision includes a provision for mandatory attorneys fees. As such, the agreement should not be enforced.

As such, and as explained further below, Best Rate's arguments fall apart, and the Court should deny its Motion to Compel Arbitration.

## II.      STATEMENT OF FACTS

Best Rate Holdings is a mortgage marketing company located in Clearwater, Florida. (Compl. ¶ 2.) Best Rate promotes and sells a variety of marketing products, including: marketing leads, telemarketing services, and contact lists. (*Id.* ¶ 9.)

Beginning in or around February 2017, Plaintiff Temple received an email message from Best Rate purporting to offer one-percent mortgage loans for military veterans. (Compl. ¶ 25.) Temple clicked the link and was taken to a website where he entered in his information. (*Id.* ¶ 26.) At no time was Temple shown consent language required under the TCPA. Further, at no point during his visit to the website was he ever presented with any specific arbitration agreement or even with a copy of the Terms more generally.

Soon after, Temple began receiving text messages on a weekly basis from the Defendants. (*Id.* ¶¶ 27-28.) Ultimately, Temple decided the text messages were annoying so he responded, "Stop" to opt-out. (*Id.* ¶ 31.) Despite repeated opt out attempts—including trying different variations of the word "stop"—Defendants refused to honor Temple's stop requests and he was subjected to continued, annoying messages. (*Id.* ¶ 32.)

Temple filed the instant lawsuit on January 22, 2018 alleging that Defendants' post-STOP text messages violated the TCPA. On March 16, 2018, Best Rate filed its motion to compel arbitration (Dkt. 18) based on Temple's supposed consent to the Terms located on the Veteran's Loans Website. As explained below, this Court should deny Best Rate's Motion to Compel Arbitration.

## III.   ARGUMENT

"In deciding whether to stay proceedings or compel arbitration under the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* . . . . we must determine: (1) whether there is a valid written agreement to arbitrate; (2) whether the issue is arbitrable under the agreement; and (3) whether the party asserting the claims has failed or refused to arbitrate the claims." *Collins v. International Dairy Queen*, 990 F.Supp. 1469, 1471 (M.D. Ga. 1998) (citing 9 U.S.C. §§ 2-4; *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 400, 87 S.Ct. 1801 (1967)).

3

The Court should refuse to compel arbitration here for at least four reasons. First, the Terms constitute an unenforceable browsewrap agreement. Second, Temple's claims fall outside the limited scope of the arbitration agreement in any case. Third, the arbitration agreement is procedurally and substantively unconscionable. Fourth and finally, the arbitration agreement doesn't cover Temple's claims for injunctive relief seeking to put an end to the calls.

For these reasons, and as explained below, Defendant's Motion to Compel Arbitration should be denied.

**A.      Best Rate cannot rely on its Terms and Conditions for its contention that Temple agreed to arbitrate his claims—the Terms are an unenforceable browsewrap agreement.**

Best Rate cannot take advantage of the arbitration agreement buried in its Terms to escape this litigation—the Terms constitute an unenforceable browsewrap agreement.

"Contracts formed on the Internet come primarily in two flavors: 'clickwrap' (or 'click-through') agreements, in which website users are required to click on an "I agree" box after being presented with a list of terms and conditions of use; and 'browsewrap' agreements. . ." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–76  (9th Cir. 2014). Unlike clickwrap agreements, "'[b]rowsewrap agreements are those that purport to bind the users of websites' where 'the text of the agreement is [generally] located on a separate webpage hyperlinked to the website the user is accessing.'" *Herman v. Seaworld Parks & Entertainment, Inc.*, Case No: 8:14-cv-3028-T-35JSS, 2016 WL 7447555, at *4 (M.D. Fla. Aug. 26, 2016) (citing *AvePoint, Inc. v. Power Tools, Inc*. 981 F. Supp. 2d 496, 510 (W.D. Va. 2013)).

In distinguishing between "clickwrap" and "browsewrap" agreements, this Court has explained that:

> Unlike "clickwrap" agreements, where users are required to click an "I agree" box after being presented with a list of terms and conditions, browsewrap agreements do not require the user explicitly to assent to the terms and conditions of the

agreements expressly; a party instead purportedly gives consent simply by using the website. "The defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the [terms of the] browsewrap agreement or even knowing that such a webpage exists."

*Herman*, 2016 WL 7447555, at *4 (citations omitted). Therefore, "'[b]ecause no affirmative action is required by the website user to agree to the terms of a contract other than his or her use of the website, the determination of the validity of the browsewrap contract depends on *whether the user has actual or constructive knowledge* of a website's terms and conditions.'" *Id.* (emphasis added).

With respect to actual or constructive knowledge, "[w]here 'there is no evidence that the website user had actual knowledge of the agreement, the validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract.'" *Id.* at *5 (citing *Nguyen*, 763 F.3d 1171). In *Herman*, this Court found that a defendant's terms and conditions constituted an unenforceable browsewrap agreement where the hyperlink to the terms and conditions was at the bottom of the page and below the "Continue" button. *Id.* ("[T]he hyperlink is in small-print type at the very bottom of the website and users must, unprompted, undertake to affirmatively scroll to the bottom of the page to see the link."). Further, the Court noted that users could complete their purchases without ever having to see the hyperlink at all. *Id.* ("Moreover, unlike the circumstances in *Nguyen*, a SeaWorld user may complete a purchase of passes on the website without having to bring the hyperlink within his or her line of vision.").

The Veteran's Loans Website does even less to put visitors on notice of the Terms than SeaWorld's terms and conditions in *Herman*. That is, Temple was required to complete four separate pages of information and click a box to affirm each; however, the terms and conditions hyperlink was located in only two discrete locations: (1) the very bottom of the website; and (2)

on the very bottom of the fourth page of information. (*See Veteran's Loan Website* Screenshots, true and accurate copies of which are attached hereto as Ex. A.)[1]

To begin, a user accesses the Veteran's Loan Website, selects the desired loan type and clicks "Next Step"—with no reference to any terms and conditions present anywhere on the top half of the website or directing visitors to the terms. Rather, all that appears is an unremarkable link that says "Terms" at the very bottom of the page if one happens to scroll down (*See* Ex. A, pg. 1), but nothing in the top half of the page signals to the viewer to scroll down.

Next, the user is prompted to enter his or her credit score and confirm their military service and then select "Next Step"—at this point, there is still no reference to any terms and conditions apart from the nondescript "Terms" link at the bottom. (*See* Ex. A, pg. 2.)

On the third page the user is prompted to enter his or her zip code, city, and state and then select "Next Step," which, yet again, contains no reference to any terms and conditions apart from the link at the bottom of the page. (*See* Ex. A, pg. 3.)

Finally, on the last page, the user must enter information for the following 11 categories: (1) Currently in VA; (2) Current Interest Rate; (3) Est. Home Value; (4) Loan Amount; (5) Additional case needed; (6) Are you currently late on your mortgage; (7) First Name; (8) Last Name; (9) Address; (10) Phone Number; and (11) Email Address. (*See* Ex. A, pgs. 4-5.) Following the entry of this information, the user may then scroll down and select "Get A Quote." (*See* Ex. A, pg. 5.) Notably, the "Get a Quote" button appears before a paragraph filled with difficult to read fine-print that contains a link to "Terms and Conditions." This link is not, as Best Rate has asserted, presented above or before the "Get a Quote" button. (*Compare* Ex. A, pg. 5;

---

[1] It is worth noting that the fourth page of Best Rate's data entry process, unlike all of the other pages, cannot be contained on a single page; therefore, it is presented in three separate pages. The Veteran's Loan Website is located at www.veteransvaloans.com.

*and* www.veteransvaloans.com; *with* Ex. A to Def. Mot. at ¶¶ 8-10.) In other words, a user can enter all of the required information and click "Get a Quote" without ever seeing the hyperlink to the Terms.

Such terms mimic the flaws in SeaWorld's website in *Herman*. That is, visitors of the Veteran's Loan Website are able to complete Best Rate's entire data entry process "without having to bring the hyperlink within his or her line of vision." Additionally, and just like in *Herman*, a user is not required to click a checkbox or to review the Terms before proceeding to "Get a Quote." (*See* Ex. A, pg. 5.) Instead, all that is offered is a small hyperlink buried at the very end of the fine-print at the last step, which itself is presented in a light grey font on a light grey background. (*See* Ex. A, pg. 5.) Given that Best Rate requires users to complete seventeen (17) data entry boxes and click four (4) prompts to complete the process, it is telling that Best Rate relegates the Terms to fine-print and fails to require any form of review or affirmative assent. (*Id.*) As a result, it cannot be said that a reasonable user of Best Rate's website has actual or constructive knowledge of the terms and conditions.

Accordingly, the Court should deny Best Rate's Motion to Compel Arbitration because the Veterans Loans Website fails to put visitors on actual or constructive notice of the Terms and therefore constitutes an unenforceable browsewrap agreement.

**B.     Even if, assuming *arguendo*, the Court were to conclude that Temple agreed to Best Rate's Terms, the claims at issue are outside the contract's scope in any case.**

Best Rate's bid to send the case to arbitration also fails because the dispute falls outside the scope of Best Rate's arbitration agreement. As an initial point, "the choice-of-law rules of the forum state determine what law governs . . . and under Florida law, courts 'enforce choice-of-law provisions unless the law of the chosen forum contravenes strong public policy.'" *Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 932 (11th Cir. 2013) (citing

*Maxcess, Inc. v. Lucent Technologies, Inc.*, 433 F.3d 1337, 1341 (11th Cir. 2005)). Notably, when faced with a choice-of-law provision relating to the construction and execution of the contract, courts will apply the law of the chosen state and not the forum state to those issues. *See Solution Z v. Alma Lasers, Inc.*, 2013 WL 12246356, at *4 (S.D. Fla. Jan. 22, 2013) ("The choice-of-law provision provides that '[t]his contract and these terms and conditions shall be governed by and construed according to the laws of the state of Illinois.' . . . Accordingly, the Court finds that the choice-of-law provision is narrow and governs only the scope and the effect of the contract.") (citations omitted).

Here, Best Rate's own terms and conditions expressly state, "[t]he Agreement shall be treated as though it were executed and performed in New York, New York and *shall be governed by and construed in accordance with the laws of the State of New York*." (*See* Best Rate's Terms and Conditions, a true and accurate copy of which is attached hereto as Ex. B) (emphasis added). Thus, determinations about the contractual terms at issue here should be made pursuant to New York law.

### 1.    The issue of scope is for the Court to determine, not the Arbitrator.

Rather than demonstrate that the claims at issue are covered by the Terms of the arbitration agreement, Best Rate argues that this is an issue for the arbitrator to decide. (Def. Mot. at 5-7.) Best Rate is mistaken.

Under New York law, "[g]enerally it is for the courts to make the initial determination as to whether the dispute is arbitrable, that is 'whether the parties have agreed to arbitrate the particular dispute.'" *Nationwide Gen. Ins. Co. v. Investors Ins. Co. of America*, 332 N.E.2d 333, 335 (N.Y. 1975). "Ideally then the courts should confine themselves to the arbitration clause and leave the overall contract to the arbitrators. This, of course, is facilitated when the arbitration

8

clause sp*ecifies the issues which are subject to arbitration* and those which are not." *Id.* (emphasis added). Further, where the parties agreement "contains a narrow arbitration provision, the reference to the AAA rules does not constitute clear and unmistakable evidence that they intend to have an arbitrator decide arbitrability. Thus, that question is for the court to decide in the first instance." *Zachariou v. Manios*, 891 N.Y.S.2d 54, 55 (N.Y. App. Div. 2009). An arbitration clause is considered "broad" when "'(t)he language of the agreement to arbitrate *** must be sufficiently broad so as to permit of the application of the general principle that all issues subsequent to the making of the contract are not for the court but for the arbitrators.'" *R. H. Macy & Co., Inc. v. National Sleep Products, Inc.*, 347 N.E.2d 887, 888 (N.Y. 1976).

The arbitration clause at issue here is narrow and specifies the disputes subject to arbitration. In relevant part the clause states that it applies to any dispute that arises "concerning the Site Offerings, the terms and conditions of the Agreement or the breach of same by any party hereto." (Ex. B, ¶ 19.) Thus, there are only two issues subject to arbitration: (1) disputes concerning Site Offerings and (2) disputes concerning the terms and conditions. Therefore, it cannot be said that this provision covers "all issues subsequent to the making of the contract." Instead, and as further explained in Section B, 2, *infra*, Temple's claims arose wholly separate from the Site Offerings and Terms.

Accordingly, the Court should find that the determination of whether the arbitration agreement applies to Temple's claims is a matter for the Court to decide.

### 2. Best Rate's narrow arbitration provision should not be extended to cover Temple's TCPA "STOP" calling claims.

Best Rate attempts, without success, to twist its Terms so as to make them applicable to Temple's TCPA claims. (Def. Mot. at 12-14.) Best Rate's wordplay falls short—Temple's claims simply aren't covered by the supposed agreement.

"When an arbitration agreement clearly demonstrates that the parties intended to narrow the scope of arbitration, that intent must be given effect by limiting arbitration to those subjects 'expressly and unequivocally encompasse[d]' in the arbitration agreement." *In re Massena Cent. School Dist. (Massena Confederated School Employees' Ass'n, NYSUT, AFL-CIO)*, 918 N.Y.S.2d 1312, 1315 (N.Y. App. Div. 2011) (citations omitted). "The agreement to arbitrate must be express, direct and unequivocal as to the issue or disputes to be submitted to arbitration . . . The law does not require the parties to arbitrate a claim which they did not intend to arbitrate." *Matter of We're Associates Co.*, 557 N.Y.S.2d 930, 932 (N.Y. App. Div. 1990).

In relevant part, Best Rate's arbitration provision states that it applies "[s]hould a dispute arise concerning the Site Offerings, the terms and conditions of the Agreement or the breach of same by any party hereto." (Ex. B, ¶ 19.) In asserting that the provision governs the claims at hand, Best Rate contends that Plaintiff's claims concern the Site Offerings. (Def. Mot. at 12.) Critically, Best Rate mischaracterizes section (d) of the Site Offerings, which, in its entirety states as follows:

> (d) utilizes the various contact forms and/or contact information made available on the Site as a means to contact directly, or request to be contacted by, Company and/or Company's third-party mortgage and/or home loan-related product and/or service providers ("Third Party Mortgage Service Providers").

(Ex. B, pg. 1.) When read in full it is evident that Plaintiff's claims don't concern or implicate such conduct. That is, for his dispute to concern section (d) of the Site Offerings, the dispute would have to be related to "utilizing the various contact forms and/or contact information made available on the Site." But Plaintiff doesn't allege claims regarding the contact forms. Indeed, Temple doesn't claim that the consent on the website was unlawful or that he didn't enter the information on the website but was called anyway. Instead, Temple's claims—which challenge Defendants' faulty opt-out mechanism—arise from conduct that occurred months after visiting

10

the website and don't concern his use of the website at all. Again, Temple's claims are about Defendants' refusal to stop sending him text messages after he responded, "STOP."

Noticeably absent from Best Rate's Terms is any mention of text messages or opt-out mechanism. (*See* Ex. B.) This silence speaks volumes given the fact that Best Rate's current Terms include a section titled "Text messages" that now expressly incorporates the opt-out mechanism into the agreement. (*See* Current Terms and Conditions, a true and accurate copy of which is attached hereto as Ex. C.) Hence, while the Site Offerings may now be broadly worded to cover Best Rate's sending of text messages and a failure to process opt-outs, during the relevant period of time when Temple was subjected to the Terms they were simply more limited in scope.

In sum, Temple's claims fall outside the purview of Best Rate's arbitration provision in any case, and the Court should deny Best Rate's Motion for this reason as well.

### C.    The agreement is procedurally and substantively unconscionable.

As a final matter, the arbitration agreement set forth in the Terms is unenforceable because it is unconscionable.

An arbitration agreement is susceptible to the same contract defenses as any other contract. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). One of those contractual defenses is unconscionability. "'Under New York Law, a contract is unconscionable when it is 'so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable [sic] according to its literal terms.''" *Raniere v. Citigroup Inc.*, 827 F.Supp.2d 294, 308 (S.D.N.Y. 2011) (citing *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1 (1988)). "Generally, there must be a showing that such a contract is both procedurally and substantially unconscionable." *Id.* Ultimately, "a contract or

clause is unconscionable when there is an 'absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'" *Desiderio v. National Ass'n of Securities Dealers, Inc.*, 191 F.3d 198, 207 (2d Cir. 1999) (citation omitted).

As explained below, Best Rate's Terms suffer from fatal doses of both procedural and substantive unconscionability.

### 1. Best Rate's presentation of the Agreement was procedurally unconscionable.

Determining whether a contract is procedurally unconscionable "requires an examination of the contract formation process and the alleged lack of meaningful choice. The focus is on such matters as the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power." *Rosenfeld v. Port Auth. of New York & New Jersey*, 108 F. Supp. 2d 156, 164 (E.D.N.Y. 2000)

Applied here, Best Rate's browsewrap Terms are presented in a contract of adhesion on a take-it-or-leave-it basis. Temple, a layperson, had no bargaining power and no negotiation opportunity in the formation of this contract. Further, to view the Terms at all a user must go through four pages of data entry and read through the fine-print located below the "Get Quotes" button. (*See* Ex. A.) Then, a user must read through the entire agreement down to paragraph nineteen. (*See* Ex. B.) Once there, the class waiver itself is not set off in a separate paragraph despite Best Rate claiming it is an "independent agreement." (*See* Ex. B.)

In short, Best Rate's Terms bear all the hallmarks of a procedurally unconscionable agreement.

### 2.  The Terms are so one-sided that the arbitration agreement is substantively unconscionable

The Terms are also substantively unconscionable. First, the class action waiver doesn't bind both Parties. That is, only website visitors/consumers ostensibly waive their right to proceed as part of a class action. (*See* Ex. B, ¶ 19.) Indeed, nothing indicates that Best Rate is also required to forego its right to seek class-wide relief. (*Id.*)

Second, and even more one-sided, is a provision that states that website visitors must "agree to pay the attorney's fees and court costs that Company incurs in seeking" any injunctive relief against consumers who seek to participate in a class action. (*Id.*) This language is so broad that, even if the Company were to seek injunctive relief but lose, website visitors would still supposedly be on the hook for Best Rate's court costs and attorneys' fees. The provision is drawn drastically in favor of Best Rate, dissuades consumers with legitimate claims from pursuing relief in court, and exceeds the bounds of what is fair and reasonable.

Further, any attempt to analogize this case to the arbitration agreement at issue in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011) fails. In that case, AT&T's arbitration agreement was laden with consumer-friendly incentives that made arbitration a more-even playing field in that case. Indeed, AT&T's arbitration agreement was objectively favorable to consumers with valid claims, specifying that: (1) AT&T had no ability to seek reimbursement of its attorney's fees; and (2) in the event that a consumer received an arbitration award greater than AT&T's last written settlement offer, AT&T would pay a $7,500 minimum recovery and twice the amount of the consumer's attorney's fees. *Concepcion*, 131 S. Ct. at 1744. Such provisions were deemed sufficient in the eyes of the Supreme Court to incentivize attorneys to assist AT&T's customers in vindicating their rights. *Id.* at 1753 (approving the district court's finding that "the scheme [is] sufficient to provide incentive for the individual prosecution of meritorious

13

claims that are not immediately settled" and the Ninth Circuit's finding that consumers who filed claims would be "essentially guaranteed" to be made whole.) The Supreme Court agreed with the District Court that consumers would be better off arbitrating than proceeding as part of a class action.

In this case, unfortunately, Best Rate's Terms contain few of the consumer-friendly provisions found in *Concepcion*. In short, unlike *Concepcion*, there is little incentive to actually proceed with arbitration—allowing Best Rate to escape being held accountable for its conduct. Indeed, there is no incentive in Best Rate's agreement for attorneys to take on cases—attorney's fees can only be recovered if a consumer beats Best Rate's Final Settlement Offer. And a Final Settlement Offer is only potentially available after a consumer submits an Initial Dispute Notice on Best Rate's website and waits to see whether Best Rate chooses to make such an Offer. In reality, Best Rate holds all of the cards when it comes to the potential recovery of attorneys' fees by consumers—it can simply choose to not make a Final Settlement Offer, even if a consumer jumps through the hoop of submitting a Dispute Notice, and thereby insulate itself from paying a consumer's attorneys' fees.

Perhaps most glaringly, the Terms state that Best Rate **will seek an award of attorneys' fees and expenses from consumers if an arbitrator determines that the claim was frivolous**. As such, not only are consumers barred from pursuing their claims in Court and on a class basis (and in practical terms prevented from being represented by counsel), they may end up owing Best Rate for its legal bills if an arbitrator decides, based on no defined criteria, that the claim is frivolous. Best Rate's dispute resolution provisions are damaging to consumers and the Court should refuse to compel arbitration here.

Thus, the Court should decline to compel arbitration for this reason as well.

**D.** **At the very least, Temple's claims for injunctive relief—which he needs given Defendants' failure to cease the transmission of such text messages—are not covered by the arbitration agreement.**

Even if the Court were to decide that Best Rate's arbitration agreement is enforceable against Temple, and that Temples claims fall within the scope of the Terms, and that the agreement isn't so unconscionable so as to be unenforceable, the Court should refuse to send Temple's claims for injunctive relief to arbitration.

To be clear, the TCPA allows litigants to seek injunctive relief in addition to damages. *Drew v. Lexington Consumer Advocacy*, No. 16-CV-00200-LB, 2016 WL 9185292, at *9 (N.D. Cal. Aug. 11, 2016) (" The TCPA authorizes private actions for injunctive relief and/or damages equal to the greater of actual monetary loss or $500. (citing 47 U.S.C. §§ 227(b)(3)). Temple prays for relief in the form of "an injunction requiring Defendants to cease all unsolicited text messaging and to honor opt out requests, and otherwise protecting the interests of the Class." (Dkt. 1 at 15.) Best Rate's Terms, in turn, state that "nothing contained herein shall be construed to preclude any party from: (i) seeking injunctive relief in order to protect its rights pending an outcome in arbitration . . ." (See Ex. B, ¶ 19.) Temple's claims are rooted in Defendants' failure to process his "Stop" requests and his receipt of additional, annoying messages. Indeed, even after this lawsuit was filed Temple has continued to receive additional harassing text messages from Defendants. Without injunctive relief, the messages will continue and Temple will be required to constantly update his pleadings to add additional messages. Under the plain language of the arbitration agreement, Temple's claims for injunctive relief, fall outside the scope of which claims must be decided by the arbitrator.

Any assertion by Best Rate that the injunctive relief provision merely refers to *its* right to seek injunctive relief staying any alleged class action while it pursues defenses in arbitration,

must fail—that is not how the provision is written or operates. Rather, under the plain language of the agreement either Party may seek appropriate and necessary injunctive relief from the Court. Temple continues to get text messages even though he responded STOP and filed a lawsuit. Injunctive relief is likely necessary to protect his rights during the pendency of the arbitration proceedings.

To the extent the language regarding injunctive relief is unclear, that ambiguity must be construed against Best Rate as the drafter. *See Judd Burstein, P.C. v. Long*, 180 F. Supp. 3d 308, 312 (S.D.N.Y. 2016) (quoting *McCarthy v. Am. Int'l Grp., Inc.*, 283 F.3d 121, 124 (2d Cir. 2002)) ("Where a contract is ambiguous, 'New York follows the well-established *contra proferentem* principle which requires that equivocal contract provisions are generally to be construed against the drafter.'"). The agreement here was not the product of a mutual negotiation among parties of equal bargaining power—instead, Best Rate drafted each provision of its Terms and presented it to everyone who visited one of its websites on a take-it-or-leave-it basis. Simply put, it cannot be said that the arbitration clause at issue was drafted by anyone but Best Rate, and any ambiguity regarding the arbitration provision's carve out for claims seeking injunctive relief must therefore be construed against it.[2]

As such, even if Temple's damages claims are sent to arbitration (they shouldn't be), injunctive relief is necessary and appropriate to ensure that the text message system is fixed so that "Stop" requests are honored. Temple has received numerous additional text messages after replying "Stop," and the harm is ongoing. In fact, Temple has received additional messages from

---

[2] Importantly, each member of the alleged Class would be treated the same way. Section 211(2) of the Restatement recognizes the equal treatment of class members in terms of form contracts, stating, "[s]uch a writing is interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing." Restatement (Second) of Contracts § 211(2) (Am. Law Inst. 1981).

Defendants since this lawsuit was commenced. At the very least the Court should enjoin Best Rate from sending unsolicited text messages and from failing to honor opt-out requests while the arbitration proceeding is pending.

## IV.    CONCLUSION

Best Rate plainly violated the TCPA—it sent text messages to consumers after it was told to "Stop." Facing clear liability to every similarly situated person, Best Rate seeks to dodge taking responsibility for its conduct by invoking an arbitration agreement buried at the bottom of one of its various websites. While arbitration contracts are to be enforced like any other agreement, Best Rate's Terms comprise an unenforceable browsewrap agreement, Temple's "Stop" claims fall outside their scope, and the contract is both procedurally and substantively unconscionable in any case. Finally, Temple's claims for injunctive relief may be pursued in Court. As such, the Court should refuse to bail out Best Rate by compelling arbitration here.

Dated: April 13, 2018                     Respectfully submitted,

                                          **JOHN TEMPLE,** individually and on behalf of all
                                          others similarly situated,

                                          /s/ Patrick H. Peluso
                                          One of Plaintiff's Attorneys

                                          Ryan S. Shipp, Esq.
                                          814 W. Lantana Rd. Suite 1
                                          Lantana, Florida 33462
                                          Tel: (561) 699-0399
                                          Ryan@shipplawoffice.com

                                          Steven L. Woodrow
                                          swoodrow@woodrowpeluso.com
                                          Patrick H. Peluso
                                          ppeluso@woodrowpeluso.com
                                          Woodrow & Peluso, LLC
                                          3900 East Mexico Ave., Suite 300
                                          Denver, Colorado 80210
                                          Tel: (720) 213-0675

17

Fax: (303) 927-0809

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on April 13, 2018 I served the above and foregoing papers by causing such paper to be filed with the Court using the Court's electronic filing system, which will send copies of such paper to all counsel of record.


April 13, 2018                                    By:  /s/ Patrick H. Peluso