JOHN TEMPLE,

      Plaintiff,

v.                                                                    Case No: 8:18-cv-176-T-36JSS

BEST RATE HOLDINGS LLC and
LENDING TREE INC.,

      Defendants.

_____/

## <u>ORDER</u>

This cause comes before the Court upon Defendant Best Rate Holdings, LLC's ("Best Rate") Motion to Compel Arbitration (Doc. 18), Plaintiff John Temple's ("Plaintiff") response in opposition (Doc. 25), Best Rate's reply in support of its motion (Doc. 30), Defendant Lending Tree, LLC's[1] ("Lending Tree") Motion to Compel Arbitration and Stay Proceedings (Doc. 20), Plaintiff's response in opposition (Doc. 26), and Lending Tree's reply in support of its motion (Doc. 31).

In its motion, Best Rate argues that it and Plaintiff agreed to submit all issues, including gateway questions of arbitrability, to arbitration. Alternatively, Best Rate argues, if the Court determines that gateway questions of arbitrability are for the Court to decide instead of the arbitrator, then the Court should hold that arbitration is required pursuant to the agreement between Best Rate and Plaintiff. In response, Plaintiff argues that the agreement is not enforceable and that, even if it were, his claim falls outside the scope of arbitration.

---

[1] Lending Tree suggests that Plaintiff intended to name Lending Tree, LLC rather than Lending Tree, Inc. Doc. 20.

In its motion, Lending Tree argues that it can also enforce Best Rate's and Plaintiff's agreement and compel arbitration because it is an intended third-party beneficiary. Alternatively, Lending Tree argues, Plaintiff should be estopped from avoiding arbitration with Lending Tree because Plaintiff's claim against Lending Tree is combined with his claim against Best Rate. Plaintiff disagrees with both contentions. The Court, having considered the motions and being fully advised in the premises, will grant the motions.

## I.    BACKGROUND

Plaintiff filed a single-count putative class action complaint against Best Rate and Lending Tree (collectively, "Defendants"), alleging violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, based on purported text messages sent by Defendants to Plaintiff's wireless telephone number using an automatic telephone dialing system. Doc. 1 at ¶¶ 14-15, 28-29, 34. Best Rate is a digital marketing company that operates websites used to provide marketing and lead generation services for its advertiser customers. Doc. 18-1 at ¶ 4. Lending Tree is an online exchange that connects consumers with third-party lenders, banks, and credit partners who compete for the consumers' business. Doc. 20 at p. 2.

Plaintiff began receiving the text messages at issue in February 2017, after signing up to obtain information about a one-percent mortgage loan for military veterans advertised in an e-mail message from Defendants. Doc. 1 at ¶¶ 25, 27. To obtain more information about the one-percent offer, Plaintiff clicked on the link in the e-mail message. Doc. 1 at ¶¶ 25-26; Doc. 25 at p. 3. Plaintiff was taken to Best Rate's website, www.veteransvaloans.com. Doc. 18-1 at ¶ 6. Plaintiff followed various prompts on the website directing him to enter financial and contact information. Doc. 1 at ¶ 25-26; Doc. 25 at p. 3; Doc. 25-1 at pp. 2-7; Doc. 18-1 at ¶ 6. The website contained the following two paragraphs:

We take your privacy seriously. By clicking "GET A QUOTE", you agree to share your information with up to 4 participating lenders (potentially including Quicken Loans & Loan Depot), which may include the <u>following lenders</u> and <u>partners</u> regarding financial services and credit related offers and for them to contact you (including through automated means; e.g. autodialing, text and pre-recorded messaging) via telephone, mobile device (including SMS and MMS) and/or email, even if you are charged for the call or your telephone number is currently listed on any state, federal or corporate Do Not Call list. You agree that this consent is not a condition of purchase. That this is not a loan application and you are under no obligations.

By clicking "Get A Quote" you are accepting our <u>Privacy Policy</u> and <u>Terms and Conditions.</u>

Doc. 18-1 at p. 3. Clicking on the <u>Terms and Conditions</u> hyperlink (the "Terms and Conditions Hyperlink") would bring the website user to another page containing an agreement (the "Agreement") comprised of several paragraphs, including paragraph 19, the dispute resolution provision (the "Arbitration Provision"). Doc. 18-1 at pp. 2-3, 7, 14.

The Agreement provided, in pertinent part:

The following Terms and Conditions are inclusive of the Best Rate Referrals Privacy Policy ("Privacy Policy"), the Best Rate Referrals Disclosures, Disclaimers and Licenses ("Disclosures, Disclaimers and Licenses") and any and all other applicable operating rules, policies, price schedules and other supplemental terms and conditions or documents that may be published from time to time, which are expressly incorporated herein by reference (collectively, the "Agreement").

.    .    .

THE AGREEMENT CONTAINS DISCLAIMERS OF WARRANTIES, LIMITATIONS OF LIABILITY, RELEASES, A CLASS-ACTION WAIVER, AND THE REQUIREMENT TO ARBITRATE ANY AND ALL CLAIMS THAT MAY ARISE HEREUNDER. THE AFOREMENTIONED PROVISIONS ARE AN ESSENTIAL BASIS OF THE AGREEMENT.

.    .    .

**19. Dispute Resolution Provisions**. The Agreement shall be treated as though it were executed and performed in New York, New York and shall be governed by and construed in accordance with the laws of the State of New York (without regard to conflict of law principles). **Should a dispute arise concerning the Site Offerings, the terms and conditions of the Agreement or the breach of same**

**by any party hereto: (a) the parties agree to submit their dispute for resolution by arbitration before the American Arbitration Association in New York, New York, in accordance with the then current Commercial Arbitration rules of the American Arbitration Association; and (b) you agree to fist commence a formal dispute proceeding by completing and submitting an Initial Dispute Notice which can be found Here. We may choose to provide you with a final written settlement offer after receiving your Initial Dispute Notice ("Final Settlement Offer"). If we provide you with a Final Settlement Offer and you do not accept it, or we cannot otherwise satisfactorily resolve your dispute and you wish to proceed, you must submit your dispute for resolution by arbitration before a reputable arbitration organization as mutually agreed upon by the parties, in your county of residence, by filing a separate Demand for Arbitration, which is available Here. For claims of Ten Thousand Dollars ($10,000.00) or less, you can choose whether the arbitration proceeds in person, by telephone or based only on submissions. If the arbitrator awards you relief that is greater than our Final Settlement Offer, then we will pay all filing, administration and arbitrator fees associated with the arbitration and, if you retained an attorney to represent you in connection with the arbitration, we will reimburse any reasonable attorneys' fees that your attorney accrued. . . . Nothing contained herein shall be construed to preclude any party from: (i) seeking injunctive relief in order to protect its rights pending an outcome in arbitration; and/or (ii) pursuing the matter in small claims court rather than arbitration. Although we may have a right to an award of attorneys' fees and expenses if we prevail in arbitration, we will not seek such an award from you unless the arbitrator determines that your claim was frivolous.**

**To the extent permitted by law, you agree that you will not bring, join or participate in any class action lawsuit as to any claim, dispute or controversy that you may have against Company and/or its employees, officers, directors, members, representatives and/or assigns.**

Doc. 18-1 at pp. 7, 14-15 (emphasis in original).

After visiting the website[2] and providing his information, Plaintiff began receiving text messages from Defendants similar to the following: "We matched you with a Mortgage Lender to buy a home. 866-721-0351 **http://1bestmortgagerate.com/E8YH25S** Text STOP to halt[.]" Doc. 1 at ¶ 27. The referenced phone number, when dialed, connected the caller to Lending Tree.

---

[2] Best Rate avers that Plaintiff visited the website and registered to receive information on October 30, 2016. Doc. 18-1 at ¶ 6.

Doc. 1 at ¶ 29. The referenced website link, when clicked on, took the user to mortgageadvisor.com, a website owned and operated by Best Rate. Doc. 1 at ¶¶ 29-30.

Plaintiff continued to receive identical or nearly identical text messages approximately once per week. Doc. 1 at ¶ 28. Plaintiff decided to opt out of receiving the text messages, and replied to the text messages with the word "STOP" or "Stop" multiple times. Doc. 1 at ¶¶ 31-33. Defendants continued to send Plaintiff text messages despite Plaintiff's efforts. Doc. 1 at ¶¶ 32-33.

On January 22, 2018, Plaintiff filed the instant putative class action complaint against Defendants. Doc. 1 at ¶¶ 47-51. In response, Defendants each filed motions to compel arbitration.

## II.  LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides that written agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Thus, the FAA reflects federal policy favoring resolution of disputes through arbitration. *Volt Info. Scis., Inc. v. Bd. of Trs. Of Leland Stanford Junior Univ.*, 489 U.S. 468, 474-75 (1989); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (stating that section 2 of the FAA reflects a liberal federal policy favoring arbitration) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). This policy "requires courts to enforce the bargain of the parties to arbitrate . . . ." *KPMG LLP v. Cocchi*, 565 U.S. 18, 21 (2011) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985)).

Section 4 of the FAA provides that:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any . . . district court which, save for such agreement, would have jurisdiction . . . for an order directing that such arbitration proceed in the manner provided for in such agreement.

9 U.S.C. § 4. Under this provision, if the Court is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue," then it "shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." *Id.*

## III. DISCUSSION

### A. Delegation

In its motion, Best Rate contends that the Arbitration Provision includes a delegation clause, which gives the arbitrator—not the Court—the power to determine whether the instant dispute is subject to arbitration in the first instance. The Court disagrees.

Gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement to arbitrate covers a particular controversy, may, themselves, be subject to arbitration. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010). "Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (internal citations omitted) (emphasis in original). A clause designating the issue of arbitrability to an arbitrator is typically referred to as a delegation clause. *Rent-A-Ctr., W.*, 561 U.S. at 76 (Stevens, J., dissenting).

With respect to delegation clauses, the United States Supreme Court has qualified that courts "should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so." *First Options*, 514 U.S. at 944 (alterations deleted). Therefore, the usual presumption—that any doubts concerning arbitration should be resolved in favor of arbitration—is reversed. *Id.*; *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002) ("[W]here the ambiguity relates to *who* determines arbitrability—that is, the arbitrability of the

question of arbitrability—the [FAA's] presumption is reversed and a court ordinarily decides the question." (emphasis in original)). Thus, "the issue of arbitrability may only be referred to the arbitrator if there is clear and unmistakable evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator." *Bell*, 293 F.3d at 566 (quotation marks omitted) (citing *First Options*, 514 U.S. at 944-45) ("When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."). *See also JPay, Inc. v. Kobel*, 904 F.3d 923, 930 (11th Cir. 2018) (stating that questions of arbitrability are best understood as substantive questions); *Parnell v. CashCall, Inc.*, 804 F.3d 1142, 1147 (11th Cir. 2015) (applying Georgia state law to determine who decides issues of arbitrability).

Utilizing these principles, courts applying New York law[3] have held that clear and unmistakable evidence of the parties' intent to delegate issues of arbitrability to the arbitrator exists where the arbitration provision incorporates arbitration rules that empower an arbitrator to decide issues of arbitrability. *Contec Corp. v. Remote Sol., Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005) (arbitration provision providing that "any controversy arising with respect to [the agreement]" would be determined by arbitration held in accordance with the Commercial Arbitration Rules of the American Arbitration Association would clearly and unmistakably evidence the parties' intent to have the arbitrator determine arbitrability where the Commercial Arbitration Rules specifically provided that the arbitrator had the power to decide issues of arbitrability).

---

[3] The Agreement states that it "shall be treated as though it were executed and performed in New York, New York and shall be governed by and construed in accordance with the laws of the State of New York (without regard to conflict of law principles)." Although the parties alternatively cite to Florida law, *see* doc. 18 and doc. 20, they do not attempt to explain why the Court should consider Florida law.

However, under New York law, simple reference to the American Arbitration Association ("AAA") rules is insufficient to constitute "clear and unmistakable" language evincing an intent to have an arbitrator decide arbitrability where the arbitration provision is "narrow" rather than "broad." *Zachariou v. Manios*, 68 A.D. 3d 539 (N.Y. App. Div. 2009) ("[S]ince the parties' agreement contains a narrow arbitration provision, the reference to the AAA rules does not constitute clear and unmistakable evidence that they intended to have an arbitrator decide arbitrability.")

A broad arbitration provision is one that, "taken as a whole, evidences the parties' intent to have arbitration serve as the primary recourse for disputes connected to the agreement containing the clause." *Arshad v. Transp. Sys., Inc.*, 183 F. Supp. 3d 442, 447 (S.D.N.Y. 2016) (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25). Generally, broad provisions use language reflecting a sweeping grant of power to arbitrators. *Shaw Grp. Inc. v. Triplefine Inter. Corp.*, 322 F.3d 115, 121 (2d Cir. 2003). *See, e.g., Contec Corp.*, 398 F.3d at 208 (arbitration was required "[i]n the event of any controversy arising with respect to this Agreement . . . ."); *New Avex, Inc. v. Socata Aircraft Inc.*, No. 02 Civ.6519 DLC, 2002 WL 1998193, at *5 (S.D.N.Y. Aug. 29, 2002) (issues of arbitrability were for the arbitrator where arbitration provision provided that "[a]ny dispute, controversy or claim arising under or related to this agreement [shall be subject to arbitration]").

A narrow arbitration provision, on the other hand, includes language that suggests "arbitration was designed to play a more limited role in any future disputes." *Arshad*, 183 F. Supp. 3d at 447 (internal quotation marks omitted) (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25). *See, e.g., Zacharious*, 68 A.D. 3d at 540 (arbitration provision listed specific arbitrable issues); *Borecki v. Raymours Furniture Co.*, No. 17-cv-1188 (LAK)(SN), 2017 WL 5900288, at *1, *4 (S.D.N.Y. June 21, 2017), *report and recommendation adopted*, 2017 WL 5953172

(S.D.N.Y. Nov. 28, 2017) (agreement requiring arbitration for "any claim, dispute, or controversy between you and us that in any way arises from or relates to the goods and/or services you have purchased or are purchasing from us (the 'Purchases'), now or in the past" was narrow because it limited arbitrable disputes to those concerning "purchases"); *Fabry's S.R.L. v. IFT Int'l, Inc.*, No. 02 Civ. 9855 (SAS), 2003 WL 21203405, at *5 (S.D.N.Y. May 21, 2003) (agreement requiring arbitration for "dispute[s] arising from the interpretation of this agreement" was narrow because it limited arbitration to issues concerning interpretation).

Here, the parties do not dispute that the Arbitration Provision references AAA rules, which, in turn, provide the arbitrator with the power to determine arbitrability.[4] Whether the Arbitration Provision's reference to the AAA rules creates a valid delegation clause, however, turns on further interpretation of the Arbitration Provision.

Best Rate points to two sentences in the Agreement in an effort to bolster its argument that the Arbitration Provision is broad and, therefore, that a valid delegation clause exists. First, Best Rate reproduces a portion of the Arbitration Provision itself, stating: "Should a dispute arise *concerning the . . . terms and conditions of the Agreement or the breach of same* by any party hereto . . . the parties agree to submit their dispute for resolution by arbitration before the [AAA]." Doc. 18 at pp. 5-6 (bold emphasis deleted, italic emphasis added).

Rather than support Best Rate's argument, however, careful reading of the Arbitration Provision, as reproduced by Best Rate, requires the conclusion that the Arbitration Provision is narrow. The Arbitration Provision applies to a specific part of the Agreement—the terms and

---

[4] The Arbitration Provision provides that the parties "agree to submit their dispute for resolution by arbitration before the [AAA] in New York, New York, in accordance with the then current Commercial Arbitration rules of the [AAA]." Doc. 18-1 at pp. 7, 14 (emphasis deleted). The Commercial Arbitration Rules of the AAA in effect on the date Plaintiff visited the website, in turn, provide that: "The arbitrator shall have the power to rule on his or her own jurisdiction, including . . . the arbitrability of any claim or counterclaim." Am. Arbitration Ass'n, Commercial Arbitration Rules, at p. 13 (2013), https://adr.org/sites/default/files/CommercialRules_Web.pdf.

conditions—not the entirety of the Agreement. Unlike the broad arbitration provisions discussed *supra*, the Arbitration Provision here does not provide sweeping language, for example, that the parties are subject to arbitration based on any dispute or controversy "arising with respect to this agreement," *Contec*, 398 F.3d at 208, or "arising under or related to this agreement." *New Avex*, 2002 WL 1998193, at *5.

Moreover, Best Rate's reproduction of the Arbitration Provision omits additional limiting language. Read more fully, the Arbitration Provision provides that the parties agree to submit their claims for arbitration "[s]hould a dispute arise *concerning the Site Offerings, the terms and conditions of the Agreement or the breach of same* by any party hereto." Doc. 18-1 at p. 14 (bold emphasis deleted, italic emphasis added). Read in context, the Arbitration Provision limits arbitration to disputes concerning a list of specific items—the Site Offerings, the terms and conditions of the Agreement, or the breach of same—lending further weight to the conclusion that the Arbitration Provision is narrow rather than broad.

Further review of the Arbitration Provision also supports the conclusion that it is narrow rather than broad. In the same paragraph, the Arbitration Provision states: "Nothing contained herein shall be construed to preclude any party from: (i) seeking injunctive relief in order to protect its rights pending an outcome in arbitration; and/or (ii) pursuing the matter in small claims court rather than arbitration." Doc. 18-1 at p. 15. Accordingly, the Arbitration Provision, "taken as a whole," does not evidence "the parties' intent to have arbitration serve as the primary recourse for disputes." *Arshad*, 183 F. Supp. 3d at 447. Rather, the Arbitration Provision specifically authorizes the parties to utilize other avenues of adjudication.

The other sentence in the Agreement that Best Rate points to in support of its contention that the Arbitration Provision is broad and presents a valid delegation clause is located on the first

page of the Agreement and is set apart from the Arbitration Provision. It states: "The Agreement contains . . . the requirement to arbitrate any and all claims that may arise hereunder." Doc. 18-1 at p. 7 (emphasis deleted). Indeed, this sentence (the "introductory sentence") is more like the broad arbitration provisions found in *Contec* and *New Avex*. But the introductory sentence is also set apart from the Arbitration Provision by more than twenty paragraphs. *See* Doc. 18-1 at pp. 7-16. Rather than set forth any specific rules regarding arbitration, the introductory sentence merely foreshadows the Agreement's contents.

Even if the introductory sentence was relevant, however, its consideration would not change the finding here that the Agreement does not contain a valid delegation clause. The Second Circuit previously had the opportunity to analyze the effect of two inconsistent arbitration provisions in one agreement. *Katz v. Feinberg*, 290 F.3d 95, 97 (2d Cir. 2002). In *Katz*, the Second Circuit held that the presence of two arbitration provisions in the same agreement, one provision broad and the other narrow, created an ambiguity, therefore precluding a determination that the parties had clearly and unmistakably delegated arbitrability to the arbitrator. 290 F.3d at 97. The Second Circuit reasoned:

> [W]e cannot conclude that in this case where a single agreement contains both a broadly worded arbitration clause and a specific clause . . . that the parties' intention to arbitrate questions of arbitrability under the broad clause remains clear. We find the presence of both these clauses creates an ambiguity, which, under *First Options*, requires us to assign questions of arbitrability to the district court, not the arbitrator.

*Id.* (citing *First Options*, 514 U.S. at 944).

When the introductory sentence is considered here, the result is the same: one part of the Agreement suggests the scope of arbitration is broad, while another part specifically limits arbitration to certain topics. Applying the reasoning in *Katz*, the Court could conclude only that the Agreement is ambiguous with respect to arbitration and, therefore, that there is not evidence

of the parties' clear and unmistakable intent to designate the question of arbitrability to the arbitrator.

Because the Arbitration Provision is narrow, or, alternatively, because it is ambiguous, there is not clear and unmistakable evidence that the parties agreed to arbitrate arbitrability. *First Options*, 514 U.S. at 944; *Katz*, 290 F.3d at 97; *Zachariou*, 68 A.D. 3d at 539. Thus, the issue of arbitrability is left for the Court.

## B.      Enforcement

Having determined that the Court must decide issues of arbitrability, the Court turns to the parties' other arguments. Plaintiff argues that the Arbitration Provision is unenforceable, and that he cannot be compelled to arbitrate his claim, for two reasons: first, because the Agreement is a browsewrap agreement and second, because the Agreement is unconscionable. The Court addresses each of Plaintiff's contentions in turn below.

### 1.      Browsewrap

Where one party offers terms of a contract to another, "unequivocal acceptance of the terms by the receiving party is required." *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 396-98 (E.D.N.Y. 2015) (applying New York, California, and Illinois law, which the court held are "substantively similar with respect to the issue of contract formation"). *See also Specht v. Netscape Commc'ns. Corp.*, 306 F.3d 17, 29 (2d Cir. 2002) (applying California law) ("Mutual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract.").

Contracts available on the internet come in different forms. Two such forms include "clickwrap" agreements and "browsewrap" agreements. *Berkson*, 97 F. Supp. 3d at 396-98. Clickwrap agreements, which courts generally find enforceable, "necessitate an active role by the user of a website." *Id.* at 397. They "require a user to affirmatively click a box on the website

acknowledging awareness of and agreement to the terms of service before he or she is allowed to proceed with further utilization of the website." *Id.* Because clickwrap agreements require the user to physically manifest assent, the user is "said to be put on inquiry notice of the terms assented to." *Id.*

In contrast, browsewrap agreements require a less active role by the website user. *Id.* at 395. Generally, a browsewrap agreement consists of a notice on a website stating that the user is agreeing to and is bound by the website's terms of service by merely using the website. *Id.* Because a user's consent to a browsewrap agreement is generally passive, courts "closely examine the factual circumstances surrounding" a person's use of the website and alleged assent to the terms of service. *Id.*

To be valid, a browsewrap agreement must give at least reasonable, constructive, or inquiry notice of the website's terms to the user, and the user must exhibit "unambiguous assent" to the terms. *Id.* at 395-96; *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 367 (E.D.N.Y. 2009). Determining whether a user had reasonable notice requires a fact-based analysis. *See Berkson*, 97 F. Supp. 3d at 395-96 (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014) (applying New York law)); *Hines*, 668 F. Supp. 2d at 367. The "conspicuousness and placement" of hyperlinks to terms, notices of the terms, "and the website's general design all contribute to whether" an individual would have reasonable notice[5] of a browsewrap agreement. *Nguyen*, 763 F.3d at 1177.

Courts will not enforce browsewrap agreements where the link to the website's terms are "buried at the bottom of the page or tucked away in obscure corners of the website where users are

---

[5] "[C]ourts have consistently enforced browsewrap agreements where the user had actual notice of the agreement." *Nguyen*, 763 F.3d at 1177. But, where "there is no evidence that the website user had actual knowledge of the agreement, the validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice." *Id.* Here, the parties do not present any evidence that Plaintiff had actual knowledge of the Agreement.

unlikely to see it." *Id.* (citing *Specht*, 306 F.3d at 23). In *Specht*, the Second Circuit held that a hyperlink to terms, located at the bottom of a page below the "download" button used to initiate a software download, was insufficient to place users on reasonable notice of the terms. 306 F.3d at 32. There, the link to the terms was "submerged" such that the user would have to continue to scroll down, past the "download" button, to bring the link to the terms within his or her line of sight. *Id.* at 35 ("[A] reasonably prudent offeree in plaintiffs' position would not have known or learned, prior to acting on the invitation to download, of the reference to [the] license terms hidden below the 'Download' button on the next screen."). *See also Herman v. SeaWorld Parks & Entm't, Inc.*, No: 8:14-cv-3028-T-35JSS, 2016 WL 7447555, at *6 (M.D. Fla. Aug. 26, 2016) (applying Virginia law, the principles of which are "representative of contract law generally" and holding there was no evidence that a website user assented to the website's terms where the user could complete a purchase on the website without having to bring the hyperlink to the terms "within [the user's] line of vision").

But, courts have enforced browsewrap agreements where hyperlinks to terms are conspicuous. *Nguyen*, 763 F.3d at 1177 (collecting cases). And, courts have enforced "hybrid" browsewrap agreements—that is, browsewrap agreements that resemble clickwrap agreements in that they require the user "to affirmatively acknowledge the agreement before proceeding with use of the website." *Id.* at 1176; *Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 552 (S.D.N.Y. 2018) (applying California and New York law) ("[W]hile Airbnb's initial sign-up procedure was not a classic clickwrap in the sense that the terms were presented by hyperlink instead of being shown to the user and there was no clear button affirmatively stating 'I accept,' it also was not a 'true browsewrap' either. The resulting 'hybrid agreement' weighs in favor of valid notice, as courts have generally been 'more willing to find the requisite notice for constructive assent where the

browsewrap agreement resembles a clickwrap agreement—that is, where the user is required to affirmatively acknowledge the agreement before proceeding with use of the website.'" (quoting *Nguyen*, 763 F.3d at 1176-77)).

The Southern District of New York upheld such a "hybrid" agreement in *Fteja v. Facebook, Inc*., 841 F. Supp. 2d 829 (S.D.N.Y. 2012). In *Fteja*, a user wishing to create a Facebook account would fill out "several fields containing personal and contact information." *Id.* at 834. The user then clicked a "Sign Up" button. *Id.* After clicking the "Sign Up" button, the user was taken to another page entitled "Security Check." *Id.* at 834-35. That page required the user to reenter a series of letters and numbers displayed on the page. *Id.* at 835. Below the space where the user entered that letter-number combination appeared a second "Sign Up" button. *Id.* Below that button was the following sentence: "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Service." *Id.* The words "Terms of Service" were underlined, indicating that the phrase was a hyperlink. *Id.*

Holding that Facebook's sign-up procedure gave the user reasonable notice of the terms of service, the court explained that the agreement was "somewhat like a browsewrap agreement in that the terms are only visible via a hyperlink, but also somewhat like a clickwrap agreement in that the user must do something else—click 'Sign Up'—to assent to the hyperlinked terms." *Id.* at 838.

Plaintiff argues that the Arbitration Provision here is unenforceable because it is part of a browsewrap agreement that could be found only by clicking on the Terms and Conditions Hyperlink located below the "Get a Quote" button. Plaintiff submits that—like in *Specht* and *Herman*—a user could enter all of the required information and click the "Get a Quote" button without ever seeing the Terms and Conditions Hyperlink to the Agreement. In support, Plaintiff

attaches to its response various undated screenshots of the website, showing the Terms and Conditions Hyperlink located below the "Get a Quote" button.

Best Rate disputes that the Terms and Conditions Hyperlink was located below the "Get a Quote" button, as Plaintiff describes, at the time Plaintiff visited the website. Best Rate offers evidence that the website was revised on March 21, 2018, after Plaintiff visited it. Although the Terms and Conditions Hyperlink now appears below the "Get a Quote" button, as Plaintiff describes, the website setup was different on the date Plaintiff visited the website and entered his information. Doc. 30-1 at ¶¶ 5-7. In support, Best Rate attaches the declarations of Zach South, Senior Vice President of Mortgage Operations for Best Rate. Doc. 18-1; Doc. 30-1. South avers that on the date Plaintiff visited the website, October 30, 2016, the Terms and Conditions Hyperlink was "prominently displayed and located directly above the 'Get a Quote' button that a user clicks to complete his/her registration." Doc. 30-1 at ¶ 5. The declarations provide an image of a "regenerated HMTL representation" of what the webpage looked like at the time Plaintiff registered. Doc. 30-1 at ¶ 6. That image, in turn, shows that the Terms and Conditions Hyperlink was located above the "Get a Quote" button. Doc. 30-1 at ¶ 6.

Upon careful review of Best Rate's evidence concerning the placement of the Terms and Conditions Hyperlink,[6] the Court finds that Plaintiff had reasonable notice of the Agreement and that the Agreement is enforceable. Like in *Fteja*, where the website user was cautioned that clicking the "Sign Up" button indicated his agreement to the Terms of Service, here, Plaintiff was

---

[6] Other than the allegations in his response, Plaintiff does not provide any evidence regarding the placement of the Terms and Conditions Hyperlink on the date he visited the website. Best Rate, on the other hand, has provided evidence of the placement of the Terms and Conditions Hyperlink in the form of declarations. *See Plazza*, 289 F. Supp. 3d at 543, nn. 4, 11 (accepting defendant's evidence of an archived sign-up screen and rejecting plaintiffs' evidence of an alternate sign-up screen that was not tied to the date plaintiffs accessed the website).

cautioned that clicking the "Get a Quote" button would indicate his acceptance to the Agreement available via the Terms and Conditions Hyperlink.

Moreover, given Best Rate's evidence, the issues present in *Specht* and *Herman* concerning submerged or hidden text are not present here. Here, the Terms and Conditions Hyperlink was located *above* the "Get a Quote" button—thus, Plaintiff must have brought the Terms and Conditions Hyperlink within his line of vision before viewing and proceeding to click the "Get a Quote" button.

The Terms and Conditions Hyperlink was placed in a manner conspicuous enough to provide reasonable notice to a prudent user, thereby requiring the user to affirmatively acknowledge the Terms and Conditions Hyperlink to the Agreement before proceeding. Because the website provided reasonable notice of the Agreement, it is enforceable.

### 2. Unconscionability

The doctrine of unconscionability is an equitable doctrine "intended to be sensitive to the realities and nuances of the bargaining process." *Gillman v. Chase Manhattan Bank, N.A.*, 534 N.E.2d 824, 828 (N.Y. 1988). Generally, to determine that a contract is unconscionable is to find that "the contract was both procedurally and substantively unconscionable when made—i.e., some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Id.* (internal quotation marks omitted). Upon careful review, the Court finds Plaintiff has failed to satisfy either element.

### a. Procedural Unconscionability

"The procedural element of unconscionability requires an examination of the contract formation process and the alleged lack of meaningful choice." *Id.* But a plaintiff does not lack a meaningful choice, and a contract is not procedurally unconscionable, where a plaintiff "had the

opportunity to opt out without any adverse consequences." *Tsadilas v. Providian Nat. Bank*, 786 N.Y.S.2d 478, 480 (N.Y. App. Div. 2004). *Accord Saizhang Guan v. Uber Tech., Inc.*, 236 F. Supp. 3d 711, 731 (E.D.N.Y.) (collecting cases) ("Courts applying New York law have considered an opt-out provision as an important, if not dispositive, factor in rejecting challenges of procedural unconscionability."). Here, the Arbitration Provision provided Plaintiff with thirty-days to opt-out. Doc. 18-1 at p. 15. The parties do not present any evidence that Plaintiff attempted to opt-out.

Plaintiff's argument that he had no bargaining power in the formation of the Agreement, and that the terms were presented to him on an impermissible take-it-or-leave-it basis, is unavailing. "[T]he fact [that] an arbitration agreement is presented on a take-it-or-leave-it basis is not sufficient under New York law to render the [arbitration] provision procedurally unconscionable." *Epstein Becker & Green, P.C. v. Brown*, No. 10 Civ. 4784 (LTS)(JCF), 2010 WL 3835067, at *3 (S.D.N.Y. Sept. 10, 2010) (internal quotation marks omitted). Plaintiff provides no basis for the Court to determine that the Agreement is procedurally unconscionable.

b.     Substantive Unconscionability

It is only in "exceptional cases where a provision of [a] contract is so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone." *Gillman*, 534 N.E.2d at 829. A party's failure to show procedural unconscionability is "generally fatal to an unconscionability claim. Indeed, courts applying New York law often do not address substantive unconscionability after concluding that procedural unconscionability has not been shown." *Mayaguez S.A. v. Citigroup, Inc.*, 16 Civ. 6788 (PGG), 2018 WL 1587597, at *15 (S.D.N.Y. Mar. 28, 2018).

Determining whether a contract is substantively unconscionable requires review of the contract's content. *See id.* The question "entails an analysis of the substance of the bargain to

determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged." *Gillman*, 534 N.E.2d at 829.

Plaintiff argues the Agreement is substantively unconscionable because the provisions are drawn in favor of Best Rate. Plaintiff points to the following: (1) the class action waiver, which prohibits only plaintiff, but not Best Rate, from filing or participating in a class action lawsuit; (2) the provision allowing Best Rate to recover attorney's fees it incurs in seeking injunctive relief against consumers who attempt to participate in class action lawsuits; and (3) the provision allowing Best Rate to seek attorney's fees from consumers if the arbitrator determines the consumer's claim was frivolous.

Plaintiff does not cite any case law in support of his argument that the class action waiver is procedurally unconscionable. To the extent Plaintiff argues the class action waiver is procedurally unconscionable solely because it is a class action waiver, his argument fails. *Tsadilas*, 786 N.Y.S.2d at 480 (collecting cases) ("The arbitration provision is enforceable even though it waives plaintiff's right to bring a class action."); *Saizhang Guan*, 236 F. Supp. 3d at 733 ("In recent years the [United States] Supreme Court has issued multiple decisions holding that class action waivers in arbitration agreements are enforceable.").

Moreover, the fact that an arbitration provision may not be entirely reciprocal does not equate to a finding of unconscionability. *In re Conifer Realty LLC*, 964 N.Y.S.2d 735, 739 (N.Y. App. Div. 2013) ("[M]utuality of remedy is not required in an arbitration contract."). Again, the question is whether the contract contains terms *unreasonably favorable* to one party over the other. *Gillman*, 534 N.E.2d at 829. Simply, Plaintiff fails to demonstrate that the Arbitration Provision contains any such terms. In this case, the Arbitration Provision provides Plaintiff with certain other benefits; for example, although the Arbitration Provision allows Best Rate to recover attorney's

fees for defending frivolous claims, it also allows Plaintiff to recover all filing fees, administration fees, arbitrator fees, and reasonable attorney's fees where the arbitrator awards Plaintiff relief in an amount greater than Best Rate's final settlement offer. Doc. 18-1 at p. 15.

Plaintiff's attempt to draw factual distinctions between this case and *AT&T Mobility LLC v. Concepcion* also fails. *Concepcion*, which held that the FAA preempted a California law that allowed consumers to demand classwide arbitration, dealt with a cellular telephone contract that prohibited classwide arbitration. 563 U.S. at 336-38. Plaintiff argues that the arbitration provision in that case was "laden with consumer-friendly incentives that made arbitration a more-even playing field." Doc. 25 at p. 13. But the majority opinion does not make such a sweeping declaration. Moreover, some of the content in the arbitration provision in *Concepcion* that Plaintiff points to as being "consumer-friendly"—for example AT&T's payment to consumers if they obtain an arbitration award greater than AT&T's last settlement offer—are similar to the content of the Arbitration Provision here. *See* Doc. 18-1 at p. 15 (allowing consumer to recover attorney's fees and other costs if the arbitrator awarded the consumer more than the amount of Best Rate's final settlement offer). Finally, even if Plaintiff's argument had merit, it does not logically follow that because the Arbitration Provision here is "less-even" that it must be substantively unconscionable.

### C.     Scope

#### 1.     *Generally*

Having determined that the Arbitration Provision is enforceable, the Court turns to Plaintiff's argument that he should not be compelled to arbitrate because his claim does not fit within the scope of the Arbitration Provision.

Courts apply general principles of contract interpretation to assess whether a particular claim fits within the scope of an arbitration provision. *Centocor, Inc. v. Kennedy Inst. of Rheumatology*, No. 08 Civ. 8824 (DC), 2008 WL 4726036, at *4 (S.D.N.Y. Oct. 29, 2008). "Unlike most contracts, however, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Id.* (internal quotation marks omitted) (citing *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 58 (2d Cir. 2001)).

Pursuant to the Arbitration Provision, the parties agreed to arbitrate: "[s]hould a dispute arise concerning the Site Offerings, the terms and conditions of the Agreement or the breach of same by any party hereto." Doc. 18-1 at p. 14 (emphasis deleted). "Site Offerings" is defined in the Agreement as the "'Contact Services' . . . together with the Site, Content, and Interactive Services." Doc. 18-1 at p. 7. "Contact Services" includes a website user's utilization of "the various contact forms and/or contact information made available on the Site as a means to contact directly, or request to be contacted by, Company and/or Company's third-party mortgage and/or home loan-related product and/or service providers." Doc. 18-1 at p. 7.

Plaintiff argues that his claim does not fit within the intended scope of arbitration because it does not concern the "Contact Services." Rather, Plaintiff argues, his claim—Defendants' failure to stop sending him text messages after he replied "stop"—occurred months after Plaintiff visited the website and does not "concern his use of the website at all." Doc. 25 at p. 11. Plaintiff's argument is strained, at best. Plaintiff's Complaint states that he entered his contact information in the fields on the website to "learn more" about mortgage products. Doc. 1 at ¶ 26. Plaintiff received the alleged contact from Defendants as a result of providing his information and assenting to the terms of the Agreement. Indeed, the text on the website above the "Get a Quote" button informed Plaintiff that entering his contact information and clicking "Get a Quote" would mean he agreed

to share his information with lenders and agreed to be contacted by them. Doc. 18-1 at p. 3. Defendants' alleged text messages to Plaintiff were clearly precipitated by Plaintiff's utilization of a contact form on the website, a feature described in the Agreement as part of the "Contact Services." Plaintiff offers no other explanation for why he would receive such contact. The "Contact Services," which are part of the "Site Offerings," are subject to arbitration pursuant to the Arbitration Provision.

2. <i>Injunctive relief</i>

Plaintiff contends that even if the Court sends this action to arbitration, it should maintain jurisdiction to adjudicate his claim for injunctive relief. In support, Plaintiff points to the part of the Arbitration Provision stating: "Nothing contained herein shall be construed to preclude any party from: (i) seeking injunctive relief in order to protect its rights pending an outcome in arbitration; and/or (ii) pursuing the matter in small claims court rather than arbitration." Doc. 18-1 at p. 15.

Best Rate argues that Plaintiff is not entitled to injunctive relief because it has not sent any text messages to Plaintiff since becoming aware of the Complaint. Accordingly, Best Rate argues, Plaintiff lacks standing to pursue injunctive relief because there is no real or immediate threat of receiving another text message. But whether Plaintiff has standing to bring or would prevail on a claim for injunctive relief is not before the Court at this time. Instead, the only issue before the Court is whether, and to what extent, this action should be referred to arbitration.

Notably, there are no injunction motions pending before the Court in this case. And, although the Arbitration Provision preserves the parties' rights to seek injunctive relief, it does not specify *how* a party may seek injunctive relief. That is, the Arbitration Provision does not specify that a party has a right to seek injunctive relief from a court. And, the Commercial Arbitration

rules of the AAA, referenced in the Arbitration Provision, specifically empower the arbitrator to "take whatever interim measure he or she deems necessary, including injunctive relief." Am. Arbitration Ass'n, Commercial Arbitration Rules, at p. 24 (2013), https://adr.org/sites/default/files/CommercialRules_Web.pdf. Thus, there is no basis for the Court to decide that it is better suited to adjudicate a claim for injunctive relief than the arbitrator.

Given the lack of any pending motions for injunctive relief before the Court, that Plaintiff's claim fits within the scope of arbitration, and the federal presumption in favor of arbitrability, the Court finds it appropriate for the arbitrator to determine the imposition of injunctive relief.

### D. Non-Signatory

Lending Tree also seeks to compel arbitration. Lending Tree argues it has authority to do so, despite not being a signatory to the Agreement, for two reasons. First, Lending Tree argues, it may enforce the Arbitration Provision because it is a third-party beneficiary of the Agreement. Second, Lending Tree argues, it may enforce the Arbitration Provision under an estoppel theory.

Lending Tree cites to a number of cases[7] in support of its first argument that it is a third-party beneficiary entitled to enforce the Agreement. However, on this particular point, the cases Lending Tree cites are inapposite. That is because those cases: (1) discuss general contract rules outside the context of arbitration, (2) analyze the FAA in combination with additional rules and regulations not relevant here, (3) deal with the question of whether *signatories* to an arbitration provision may compel *non-signatories* to arbitrate, rather than whether *non-signatories* may compel *signatories*, and/or (4) analyze the issue under an estoppel theory (relevant to Lending Tree's second argument), rather than a beneficiary theory. *See Van Vleet v. Rhulen Agency Inc.*,

---

[7] Lending Tree agrees that New York law applies to this dispute, yet cites both New York and Florida law throughout its motion and reply "to demonstrate that New York and Florida law are consistent." Doc. 20 at p. 6. Because New York law applies, the Court does not weigh Lending Tree's citations to Florida law.

578 N.Y.S.2d 941, 943 (N.Y. App. Div. 1992) (discussing general contract principles without respect to arbitration); *Spear, Leeds & Kellogg v. Cent. Life Assur. Co.*, 85 F.3d 21, 26-28 (2d Cir. 1996) (analyzing the FAA in combination with the New York Stock Exchange Constitution and Arbitration Rules); *Spano v. V & J Nat'l Enters., LLC*, 264 F. Supp. 3d 440, 453 (W.D.N.Y. 2017) (holding that a signatory could enforce an arbitration provision against a non-signatory third-party beneficiary under an estoppel theory because the non-signatory received a direct benefit of the contract); *Ogden Power Dev.-Cayman, Inc. v. PMR Ltd. Co.*, No. 14-cv-8169 (PKC), 2015 WL 2414581, at *9 (S.D.N.Y. May 21, 2015) (stating that signatories may bind non-signatories to an arbitration agreement under an estoppel theory where the non-signatory was a third-party beneficiary); *Borsack v. Chalk & Vermilion Fine Arts, Ltd.*, 974 F. Supp. 293, 300 (S.D.N.Y. 1997) (holding that a signatory could enforce an arbitration provision against a non-signatory third-party beneficiary); *Centocor*, 2008 WL 5082883, at *2 (denying motion for reconsideration and allowing arbitration by non-signatory against signatory to proceed under an estoppel theory).

Courts in the Second Circuit that have permitted *non-signatories* to compel *signatories* to arbitrate generally do so under an estoppel theory. *Ross v. Am. Exp. Co.*, 547 F.3d 137, 143 (2d Cir. 2008) ("[The Second Circuit has] recognized that under principles of estoppel, a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute."); *Centocor*, 2008 WL 5082883, at *2. The Second Circuit has questioned whether a non-signatory may seek to compel arbitration under any other theory:

> We have held that, in addition to estoppel, the common law principles of incorporation by reference, assumption, agency, and veil-piercing/alter ego may be utilized when a signatory moves to compel arbitration with a non-signatory to a contract containing an arbitration agreement. Where, however, as here, a non-signatory moves to compel arbitration with a signatory, it remains an open question in this Circuit whether the non-signatory may proceed upon any theory other than estoppel.

*Ross*, 547 F.3d at 143, n. 3 (internal citation omitted). *See also Moss v. BMO Harris Bank, N.A.*, 24 F. Supp. 3d 281, 290, n. 10 (E.D.N.Y. 2014) (declining to consider alternative argument that non-signatories could compel arbitration as third-party beneficiaries), *granting motion for relief from judgment*, 114 F. Supp. 3d 61 (E.D.N.Y. 2015) (granting relief from judgment ordering arbitration where arbitral forum was unavailable); *In re A2P Antitrust Litigation*, 972 F. Supp. 2d 465, 475, n. 5 (S.D.N.Y. 2013) (holding that non-signatories could enforce an arbitration provision on the basis of estoppel and declining to reach the question of whether non-signatories could compel arbitration as third-party beneficiaries).

Thus, it is Lending Tree's second argument—that it, a non-signatory, may enforce the Arbitration Provision against Plaintiff, a signatory, under an estoppel theory—that is the primary focus of the Court's analysis. Moreover, because the Court finds that Plaintiff may be compelled to arbitrate with Lending Tree on the basis of estoppel, the Court need not consider whether Lending Tree's third-party beneficiary argument has merit. *Moss*, 24 F. Supp. 3d at 290, n. 10; *In re A2P Antitrust Litigation*, 972 F. Supp. 2d at 475, n. 5.

A non-signatory may enforce an arbitration provision against a signatory under an estoppel theory when "the relationship among the parties, the contracts they signed . . . , and the issues that had arisen among them discloses that the issues the non[-]signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Denney v. BDO Seidman LLP*, 412 F.3d 58, 70 (2d Cir. 2005) (internal quotation marks omitted). A two-prong "intertwined-ness test" applied by courts in the Second Circuit examines "whether: (1) the signatory's claims arise under the subject matter of the underlying agreement, and (2) whether there is a close relationship between the signatory and the non-signatory party." *Moss*, 24 F. Supp. 3d at 286-88.

Both circumstances must exist for a non-signatory to successfully compel arbitration under an estoppel theory. *Ross*, 547 F.3d at 146; *Denney*, 412 F.3d at 70 (determining the parties had a requisitely close relationship and remanding to the district court for determination of whether the claims were intertwined with the relevant agreement). The "intertwined-ness" inquiry is "fact-specific" and includes review of a plaintiff's factual allegations. *Ross*, 547 F.3d at 144; *Denney*, 412 F.3d at 70.

### 1.    The Subject Matter of the Underlying Agreement

Determining whether a signatory's claims arise under the subject matter of the underlying agreement necessarily requires a review of the content of the underlying agreement. *In re A2P Antitrust Litigation*, 972 F. Supp. 2d at 477 (reviewing content of agreement).

Here, Plaintiff's claim clearly arises under the subject matter of the Arbitration Provision. As discussed *supra*, the Arbitration Provision includes the requirement to arbitrate disputes concerning a website user's utilization of the Contact Services—"the various contact forms and/or contact information made available on the Site as a means to contact directly, or request to be contacted by, Company and/or Company's third-party mortgage and/or home loan-related product and/or service providers." Doc. 18-1 at p. 7. Plaintiff's claim against Lending Tree concerns Lending Tree's contact of Plaintiff, which occurred as a result of Plaintiff utilizing the website's Contact Services.

Moreover, the Second Circuit has held that where the dispute (1) between the signatories and (2) between a signatory and a non-signatory are the same, the first prong may be satisfied. *See Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 128 (2d Cir. 2010) ("[T]here is no question that the subject matter of the dispute between [the signatory plaintiff] and [the signatory defendant] is factually intertwined with the dispute between [the signatory plaintiff] and [the non-signatory

defendant]. It is, in fact, the same dispute . . . ."). Here, Plaintiff's claim against Lending Tree is the same claim as that against Best Rate. As Lending Tree points out in its motion, Plaintiff's claim against Best Rate is combined with his claim against Lending Tree. Indeed, the factual allegations in Plaintiff's Complaint almost always refer to Defendants collectively, and allege that they acted in concert. Doc. 1 at ¶¶ 11-17, 22-25, 27, 32-39, 41-42, 44-46, 48-49, 52-54, 56. Even more to the point is the fact that the Complaint contains only one cause of action. Doc. 1 at p. 13. That is, the dispute between Plaintiff and Best Rate and the dispute between Plaintiff and Lending Tree is the same. Doc. 1 at p. 13.

### 2. *The Relationship Among the Parties*

The second prong of the "intertwined-ness test" requires a court to "carefully scrutinize the relationship between the non-signatory seeking enforcement . . . and the actual signatories to the agreement." *Centocor*, 2008 WL 5082883, at *1. To hold that the requisite close relationship is met, a court must find that the "relationship among the parties [is] of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement." *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 359 (2d Cir. 2008).

Courts have held that relationships are sufficiently intertwined where the non-signatory party is "linked textually" to the underlying contract, *Choctaw Generation Ltd. P'ship v. Am. Home Asur. Co.*, 271 F.3d 403, 407 (2d Cir. 2001), or where a signatory understood the extent of the non-signatory's involvement with respect to the signatories' relationship. *In re A2P Antitrust Litigation*, 972 F. Supp. 2d at 479; *Ragone*, 595 F.3d at 127 (holding that equitable estoppel was warranted despite the non-signatory not being mentioned at all in the contract because the plaintiff

non-signatory understood the extent of the non-signatory's involvement with respect to her employment, the subject of the contract).

Here, it may be said that Lending Tree was "linked textually" to the Arbitration Provision. The Arbitration Provision concerns a website user's utilization of forms to contact, or request to be contacted by, Best Rate's "third-party mortgage and/or home loan-related product and/or service providers" (the "Third Party Mortgage Service Providers"). Doc. 18-1 at p. 7. Throughout the Agreement, including the paragraph describing the Contact Services, Best Rate advises that it "does not itself provide any underlying mortgage and/or home loan-related products and/or services." Doc. 18-1 at p. 9. Rather, such potential services are offered by Best Rate's Third Party Mortgage Service Providers. Doc. 18-1 at p. 9. Accordingly, Plaintiff was on notice that his utilization of the website contact forms and simultaneous consent to the Agreement would not merely create a relationship between Plaintiff and Best Rate, but would also subject Plaintiff to potential relationships with a defined group of third parties, including, resultantly, Lending Tree.

Even if Lending Tree was not "linked textually" to the Arbitration Provision because it was not specifically named, Plaintiff reasonably should have known the potential involvement of the defined group of third parties. *See Ragone*, 595 F.3d at 127. First, as just discussed, Plaintiff was at least generally on notice that one or more other parties might contact him. Second, it appears Plaintiff even had reason to know that Lending Tree, specifically, might contact him. Once on the website, but before continuing to submit information, users were informed that clicking "Get a Quote" meant that he or she agreed to share information with certain lenders and partners. The terms "lenders" and "partners" were underlined, containing hyperlinks. Doc. 18-1 at p. 4. Those hyperlinks, when clicked, led the user to a list of names which included Lending Tree. *See* Doc.

31 at p. 5 (alleging that Lending Tree was identified as a lender); Doc. 26-2 at p. 6 (showing a list of lenders, including Lending Tree).

This conclusion that Plaintiff should be estopped from avoiding arbitration with Lending Tree comports with the general principle of estoppel theory, in the context of compelling arbitration, as articulated by the Second Circuit.

> In each case [employing the estoppel theory], the promise to arbitrate by [signatory 1], the entity opposing arbitration, was reasonably seen on the basis of the relationships among the parties as extending not only to [signatory 2], its contractual counterparty, but also to [the non-signatory], an entity that was, or would predictably become, with [signatory 1's] knowledge and consent, affiliated or associated with [signatory 2] in such a manner as to make it unfair to allow [signatory 1] to avoid its commitment to arbitrate on the ground that [the non-signatory] was not the very entity with which [signatory 1] had a contract. The estoppel did not flow merely from [signatory 1's] agreement to arbitrate with someone [signatory 2] in disputes relating to the agreement. It flowed rather from the conclusion that the relationships among the parties developed in a manner that made it unfair for [signatory 1] to claim that its agreement to arbitrate ran only to [signatory 2] and not to [the non-signatory].

*Centocor*, 2008 WL 5082883, at *1-2 (alterations in original) (quoting *Sokol Holdings, Inc.*, 542 F.3d at 361).

In short, this is not a case where a non-signatory is a "complete stranger" to a contract. *Ross*, 547 F.3d at 148. Rather, the entire reason for the Contact Services—and the Agreement's— existence was for Best Rate to connect Plaintiff with one or more possible entities within a specified group, potentially including Lending Tree. That is, there would be no Contact Services for Plaintiff to utilize and no Agreement between Plaintiff and Best Rate were it not for Best Rate's relationships with the group of third parties, including Lending Tree. *Centocor*, 2008 WL 5082883, at *2. Indeed, Plaintiff acknowledges that Best Rate and Lending Tree had a business relationship whereby Best Rate would provide Lending Tree with "marketing leads" and "contact lists." Doc. 26 at p. 3; Doc. 1. Plaintiff cannot reasonably claim that he could not know of Lending Tree's

affiliation with Best Rate. Thus, the manner in which the parties' relationships have developed would instruct that Plaintiff should be estopped from claiming that the Arbitration Agreement runs only between it and Best Rate. *Centocor*, 2008 WL 5082883, at *1.

As a final matter, the Second Circuit has held in at least one case that a plaintiff who alleges that a signatory and non-signatory acted in concert cannot then claim a lack of the requisite close relationship. *Denney*, 412 F.3d at 70 ("Having alleged . . . that [the non-signatory defendant and the signatory defendant] acted in concert to defraud plaintiffs . . . plaintiffs cannot now escape the consequences of those allegations by arguing that [the non-signatory defendant and the signatory defendant] lack the requisite close relationship . . . ." (internal citation omitted)). The same reasoning applies to Plaintiff's claim. As discussed above, Plaintiff's Complaint alleges one claim against both Defendants and is based entirely on the notion that Best Rate and Lending Tree acted together to send Plaintiff text messages in violation of the TCPA. To allow Plaintiff to make such allegations but to deny Lending Tree the ability to arbitrate the same dispute along with Plaintiff and Best Rate would run contrary to the purposes of estoppel theory and federal policy favoring arbitration.

### E. Stay

Best Rate and Lending Tree request that the Court stay this action pending the conclusion of arbitration. Pursuant to § 3 of the FAA,

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

The Court will stay this proceeding pending the arbitration of Plaintiff's claim.

## IV.  CONCLUSION

Because the Arbitration Provision does not contain a valid delegation clause under New York law, the Court decides issues of arbitrability. After careful review, the Court holds that the Agreement and Arbitration Provision are enforceable and that Plaintiff's claim fits within the scope of the Arbitration Provision. Therefore, Plaintiff's claim is subject to arbitration. Moreover, given the relationship among the three parties, Plaintiff is also compelled to arbitrate his claim with Lending Tree. Therefore, Best Rate's and Lending Tree's motions will be granted.

Accordingly, it is hereby **ORDERED that:**

1.      Defendant Best Rate's  Motion to Compel Arbitration (Doc. 18) is **GRANTED**.

2.      Defendant Lending Tree's Motion to Compel Arbitration and Stay Proceedings (Doc. 20) is **GRANTED.**

3.      Plaintiff is compelled to arbitrate his claims against Defendants Best Rate and Lending Tree as asserted herein.

4.      This action is **STAYED** pending the completion of arbitration. The parties shall file a notice informing the Court that the arbitration has been concluded, or that their dispute has otherwise been resolved, within **FOURTEEN (14) DAYS** of either of such event and immediately dismiss this case, if appropriate.

5.      The Clerk is directed to terminate all pending motions and deadlines and administratively close this case.

**DONE** and **ORDERED** in Tampa, Florida on December 27, 2018.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties